**Exhibit B**

# Suburban Teamsters of Northern Illinois Pension Plan

Withdrawal Liability Report as of December 31, 2005

David C. Feinstein

# I. INTRODUCTION AND SUMMARY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), as amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability to employers that withdraw from the plan after September 26, 1980. Under the law, there is a complete withdrawal if an employer has permanently ceased under the plan or has permanently ceased to have an obligation to contribute the plan.

A partial withdrawal occurs if there is a 70% decline in the number of base units in each of three consecutive plan years (the testing period) when compared to the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period (high base year). A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of the agreements, and continues work in the jurisdiction, of if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered.

The amount of the withdrawal liability is based on the plan's unfunded vested benefits. Vested benefits are benefits which are non-forfeitable. The unfunded vested benefits are the value of the vested benefits not covered by the market value of the plan's assets.

The plan's method of allocating liability is the "presumptive method" as described in the statute. It involves allocation of a proportionate share of the initial liability pool (established as of December 31, 1979) plus a portion of the annual changes in the unfunded vested liability. In addition, the assessment may include portions of the reallocated liabilities, established from non-collectible or non-assessable amounts. The allocation method is fully described in Appendix A.

Based upon the data used in the actuarial valuation as of January 1, 2006, the plan provisions in effect as of December 31, 2005, and the actuarial methods and assumptions as described in Exhibit III of the actuarial certification of withdrawal liability pools, we have calculated the unfunded vested liability and the corresponding pool for each plan year with the plan year ending on December 31, 2005. There was no unfunded vested liability before 2001. The unfunded vested liability and pools for plan years 2001, 2002, 2003, 2004 and 2005 are shown in section II of this report.

Because the plan must be in a position to establish withdrawal liability upon an employer's withdrawal, the calculations of the withdrawal liability pools must be made annually even if no employer has withdrawn.

The withdrawal liability pools presented in this report were used to compute withdrawal liability for employers withdrawing in the period January 1, 2006 to December 31, 2006. The proportion of each pool allocated to an employer is based upon the ratio of its obligated contributions to the total contributions received by the plan in the five-year period immediately preceding the establishment of each pool.

Upon the re-entry of an employer following assessment of withdrawal liability, payments are abated if the base units subsequent to re-entry exceed 30% of the average of the base units in the high base year. However, the re-entering employer must post a bond or escrow amount equal to 70% of the withdrawal liability payments otherwise due.

## II.  WITHDRAWAL LIABILITY POOLS

**Liability Pools**

The following chart shows the plan's unfunded vested liability for each year the initial value of each pool, and the unamortized portion of each pool as of December 31, 2005.

| Plan Year Ended in: | Unfunded Vested Liability | Liability Pools | |
|---|---|---|---|
| | | Initial value | Unamortized Portion |
| Prior to 2001 | $0 | $0 | $0 |
| 2001 | 19,212,624 | 19,212,624 | 15,370,099 |
| 2002 | 63,594,265 | 45,342,272 | 38,540,931 |
| 2003 | 52,358,981 | (8,007,539) | (7,206,785) |
| 2004 | 52,479,462 | 2,947,849 | 2,800,457 |
| 2005 | 64,074,322 | 14,569,620 | 14,569,620 |
| Total as of December 31, 2005 | | | $64,074,322 |

**Determination of Withdrawal Liability**

An employer's withdrawal liability is determined by adding up its share of the unamortized portions of the basic pools.  The employer's share of each pool is based upon the ratio of the employer's obligated contributions to the plan's total contributions in the five-year period immediately prior to the establishment of each pool.

The law also provides for a deduction to be applied in the case of small amounts.  The deduction is based upon a *de minimis* amount equal to 0.75% of the unfunded vested liability, but not greater than $50,000.  For withdrawals in the year January 1, 2006 to December 31, 2006, the *de minimis* amount was $50,000.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment may be paid in quarterly installments.  The quarterly installment is calculated as one-fourth of the product of:

(a)    the average base units in the three consecutive years which produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)    the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 8.0%.

**Employer Inquiries**

An employer is entitled to be advised, at its request, of the amount of its potential withdrawal liability, without charge except to the extent that special information has to be developed for that employer.  Employers making such requests are furnished withdrawal liability estimates.

## APPENDIX A
## THE PLAN'S METHOD FOR ALLOCATING WITHDRAWAL LIABILITY

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory method defined in Section 4211(b) of ERISA.

The gross liability of an employer upon complete withdrawal from the Plan is determined as the sum of its proportionate shares of the unamortized balances, as of the end of the Plan Year immediately preceding withdrawal, of the Initial Amount and the Annual Changes.

A.     The Initial Amount is the Plan's unfunded liability for vested benefits as of its establishment date (December 31, 1979). This is determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

B.     The Annual Changes are the changes in the Plan's unfunded liability for vested benefits as of the end of each Plan Year after its establishment date to the end of the Plan Year immediately preceding withdrawal, determined as follows:

   1.    the Plan's unfunded liability for vested benefits (not less than zero) as of the end of the Plan Year, minus
   2.    the total (not less than zero) of the unamortized balances of (i) the Initial Amount and (ii) each previous Annual Change.

**Unamortized Balances**

The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5 percent of its original amount for each year from the end of the Plan Year as of which the change was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Allocation to the Employer**

The unamortized portion of the Initial Amount and each Annual Change are prorated to an employer for determining the amount of its liability in the event of its complete withdrawal, on the basis of the ratio of the employer's obligated contributions to the Plan during an "apportionment base period". The apportionment base period consists of the five years ending with the date as of which each of the amounts was originally determined.

*De Minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocated amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000, but no more than three-quarters of one percent of the Plan's unfunded liability for vested benefits, if less. This deductible amount is reduced, dollar for dollar, by the amount by which the gross liability of the employer exceeds $100,000.

# APPENDIX B
## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY POOLS

This is to certify that we have prepared an actuarial valuation to calculate the pools used to assess withdrawal liability to employers who withdrew during the year beginning January 1, 2006. The calculations were performed in accordance with generally accepted actuarial principles and practices.

The certificate contains the following exhibits:

| | |
|---|---|
| Exhibit I: | Unfunded Actuarial Present Value of Vested Benefits |
| Exhibit II: | Withdrawal Liability Pools |
| Exhibit III: | Actuarial Assumptions and Methods |
| Exhibit IV: | Summary of Plan Provisions |

The valuation was based on information supplied by the Fund office, OBA Midwest and the Prudential Companies. We have not verified and normally would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this actuarial valuation is complete and accurate, and in my opinion the assumptions used in the aggregate are reasonably related to the experience of the plan and to reasonable expectations.

_____

David C. Feinstein
Consulting Actuary
Enrolled Actuary No. 08-3712

**EXHIBIT I**

**UNFUNDED ACTUARIAL PRESENT VALUE OF VESTED BENEFITS**

The calculations include the following participants as of December 31, 2005.

|  | December 31, 2005 |
|---|---|
| a. Active vested employees | 3,195 |
| b. Inactive employees with vested pension rights | 2,014 |
| c. Pensioners and beneficiaries | 3,023 |

The actuarial factors are shown below as of December 31, 2005.

|  | December 31, 2005 |
|---|---|
| 1. Actuarial present value of vested benefits | $533,042,371 |
| 2. Market value of assets | 468,968,049 |
| 3. Unfunded value of vested benefits for withdrawal liability purposes: (1) – (2), not less than 0 | 64,074,322 |

## EXHIBIT II

## WITHDRAWAL LIABILITY POOLS

| Pool Established December 31: | Original Amount | Pool Balance on December 31, 2005* |
|---|---|---|
| Prior to 2001 | $0 | $0 |
| 2001 | 19,212,624 | 15,370,099 |
| 2002 | 45,342,272 | 38,540,931 |
| 2003 | (8,007,539) | (7,206,785) |
| 2004 | 2,947,849 | 2,800,457 |
| 2005 | 14,569,620 | 14,569,620 |

*Each pool is written down annually at the rate of 5% of its original amount.*

## EXHIBIT III

## ACTUARIAL ASSUMPTIONS AND METHODS

| | | |
|---|---|---|
| 1. | Valuation date | January 1, 2006. |
| 2. | Cost method | Individual entry age normal. |
| 3. | Asset valuation method | The asset method is changed to phase-in the excess of actual asset return over expected over 4 years subject to a minimum of 80% of market value and a maximum of 120% of market value. For 2006 valuation, actuarial value of asserts is same as market value of assets. The phase-in will start from 2007 valuation. |
| | | For annual plan cost - market value of assets. |

4. Interest rate
    a.  Funding             7.50% per annum.

    b.  RPA '94 current liability    5.77%.

    c.  FAS 35 and withdrawal liability    8.00%.

5. Mortality
*Funding, FAS 35, OBRA '87 current liability and withdrawal liability*
    a.  Non-disabled    1971 Group Annuity set back 1 year.

    b.  Disabled    1965 Railroad Retirement Board Ultimate Table.

*RPA '94 current liability*
    a.  Non-disabled    1983 Group Annuity Table.

    b.  Disabled    1983 Group Annuity Table.

**EXHIBIT III**

**ACTUARIAL ASSUMPTIONS AND METHODS**

6. Termination

Separation rates (after the first 3 years of participation) at sample ages are shown below:

| Age | Annual Rate Per 100 Participants (Ultimate) |
|-----|------|
| 20 | 12.0 |
| 30 | 8.0 |
| 40 | 6.0 |
| 50 | 4.0 |
| 60 | 0.0 |

During the first 3 years of participation, the separation rates are:

| Years of Participation | Annual Rate Per 100 Participants (Select) |
|-----|------|
| 0 | 30 |
| 1 | 20 |
| 2 | 10 |

7. Disability

| Age | Annual Rate Per 100 Participants (Ultimate) |
|-----|------|
| 20 | .06 |
| 30 | .06 |
| 40 | .10 |
| 50 | .42 |
| 60 | .00 |

8. Retirement

Retirement rates:

| Age | Percent |
|-----|------|
| Prior to age 55 (with 25 or more benefit credits) | 1% |
| 55-58 | 5% |
| 59-60 | 15% |
| 61-64 | 25% |
| 65 | 100% |

9. Percent married

90%.

10. Age of spouse

Husbands are assumed to be 3 years older than wives.

# EXHIBIT III

## ACTUARIAL ASSUMPTIONS AND METHODS

11. Expected expenses

Expenses for the valuation year are assumed to be equal to the prior year's administrative expenses, rounded to the nearest $10,000.

12. Service after the valuation date

Active participants are assumed to earn the average number of benefit credits as was earned in the prior year by continuing active participants (on average, continuing active participants earned 0.9 benefit credits in 2005).

13. Contributions

Based on collective bargaining agreements – rates as of January 1, 2006 vary between $10.00 per week and $155.00 per week.

14. Reciprocity

Terminated vested liability is loaded by 5%. There is no load for the active liability

## EXHIBIT IV

## SUMMARY OF PLAN PROVISIONS

| | | |
|---|---|---|
| 1. | Effective date of plan | December 15, 1955. |
| 2. | Participation | An employee becomes a participant on the day he completes 10 weeks of covered employment. However, if an employee's first covered hour is on the day his employer is first obligated to contribute for him, he becomes a participant on that day. |
| 3. | Plan year | Calendar year. |
| 4. | Vesting credits | A year of vesting credit is earned for each plan year in which the participant has at least 20 weeks of employment. |
| 5. | Benefit credits | |
| | a. Future | |

| Weeks of Employment | Benefit Credits |
|---|---|
| 40-52 | 1.0 |
| 36-39 | .9 |
| 32-35 | .8 |
| 28-31 | .7 |
| 24-27 | .6 |
| 20-23 | .5 |
| 16-19 | .4 |
| 12-15 | .3 |
| 8-11 | .2 |
| 4-7 | .1 |
| less than 4 | none |

| | | |
|---|---|---|
| | b. Past | $1/10^{th}$ of a credit for each 100 hours of contiguous employment in a year prior to the employer's obligation to contribute. No more than 5 past credits or more than the future service benefit credits will be granted. |
| | c. Maximum | 38 benefit credits. |
| 6. | Period of benefit accrual | Each distinct period during which an active participant earns benefit credit beginning on first day first covered hour (not included in a previous period of benefit accrual) and ending on the day when he becomes inactive (a year with less than 10 weeks of employment). |
| 7. | Accrued benefit during a period of benefit accrual | Benefit credits for the period of benefit accrual multiplied by the benefit level factor for that period. |

# EXHIBIT IV

## SUMMARY OF PLAN PROVISIONS

8.  Accrued benefit

The total of the accrued benefits earned for each period of benefit accrual. Effective January 1, 2005, the accrued benefit for a participant is equal to:

a.  The accrued benefit as of December 31, 2003, plus
b.  The sum of the benefits earned for all periods of benefit accrual beginning January 1, 2005  The benefit earned during a period of benefit accrual is equal to 0.7 times the employer contribution rate times the number of benefit service credits earned at that employer contribution rate.

9.  Normal retirement
   a.  Eligibility

Attained age of 60 or the 5th anniversary of the date the employee became a participant or the accumulation of 5 vesting credits.

   b.  Benefit

Accrued benefit.

10.  Early retirement
   a.  Eligibility

Attainment of age 55 and 5 or more vesting or benefit credits.

   b.  Benefit

Accrued benefit reduced by 6% for each year that retirement precedes age 60.

11.  30 and Out
   a.  Eligibility

30 contributory benefit credits.

   b.  Benefit

Accrued benefit unreduced for retirement prior to age 60.

12.  25 and Out
   a.  Eligibility

25 contributory benefit credits.

   b.  Benefit

Special "25 and Out" pension based on the accrued benefit, and reduced by 6% for retirement prior to age 60; however, the reduction cannot exceed 30% of the accrued benefit. Special provisions apply to service prior to January 1, 2005.

**EXHIBIT IV**

**SUMMARY OF PLAN PROVISIONS**

13. Disability retirement
    a. Eligibility

Cessation of covered employment due to onset of permanent and total disability benefit after becoming vested and being active in at least one year during the three years preceding the onset of disability. Onset of disability must be prior to age 60.

Accrued benefit, payable for life only.

    b. Benefit

14. Deferred vested retirement
    a. Eligibility

5 or more vesting or benefit credits.

    b. Benefit

Accrued benefit, or if the participant retires early, the benefit is reduced in the same manner as an early retirement benefit.

15. Pre-retirement spouse death benefit
    a. Eligibility

5 or more Vesting or Benefit Credits.

    b. Benefit

50% of the early retirement benefit, reduced for the joint and survivor form. The benefit is reduced by 6% for each year that payment precedes the participant's age 60, but is not reduced by more than 30%. If the participant would have been eligible for an unreduced retirement benefit, the benefit is unreduced.

$200 per month.

    c. Minimum benefit

16. 10-year survivor benefit
    a. Eligibility

10 or more benefit credits and unmarried for the full year prior to death. Payable to beneficiary.

    b. Benefit

50% of the accrued benefit unreduced for payment before age 60, payable for 10 years only. The benefit is actuarially reduced if the beneficiary is a surviving child.

**EXHIBIT IV**

**SUMMARY OF PLAN PROVISIONS**

17.  Post-retirement lump sum
     death benefit
     a.  Eligibility            Disabled retirees over age 55 and all non-disabled retirees.

     b.  Benefit               12 times the retiree's monthly benefit at retirement calculated
                               in the form of the level ten-year certain and life option without
                               regard to any increases beyond the date of retirement, if retired
                               after December 31, 1995, but no more than $30,800.  If retired
                               prior to January 1, 1996, either $5,000, $3,000, $2,000 or
                               $1,000.

18.  Benefit forms for non-    Level ten-year certain and life.
     disability and death pension
                               Step down option with a guarantee of 120 payments.

                               Joint and Survivor equal to 50% joint and survivor benefit after
                               a guarantee of 120 payments have been made.

                               Joint and Survivor (with pop-up) equal to 50% joint and
                               survivor benefit after a guarantee of 120 payments have been
                               made.

19.  Benefit level factor      Based on the benefit contribution rate of the participant at the
                               end of a period of benefit accrual.

Exhibit C

## Suburban Teamsters of Northern Illinois Pension Plan
Final Withdrawal Liability Calculation for Employers Withdrawing During 2006
Employer: Roselle Lumber Co.

Contribution Ratio
1.   Contribution history

| | Plan Year Ended | Withdrawing Employer | All Employers |
|---|---|---|---|
| a. | 12/31/1997 | $29,654 | $12,096,364 |
| b. | 12/31/1998 | 27,484 | 13,223,359 |
| c. | 12/31/1999 | 27,521 | 14,752,462 |
| d. | 12/31/2000 | 29,465 | 16,928,651 |
| e. | 12/31/2001 | 32,288 | 18,662,984 |
| f. | 12/31/2002 | 33,761 | 19,863,738 |
| g. | 12/31/2003 | 33,553 | 21,689,466 |
| h. | 12/31/2004 | 36,677 | 23,393,802 |
| i. | 12/31/2005 | 43,834 | 24,821,098 |

2.   Contribution ratio for allocating changes in liability
   a.   Contribution ratio for allocating 12/31/2001 change in liability      0.001935
   b.   Contribution ratio for allocating 12/31/2002 change in liability      0.001804
   c.   Contribution ratio for allocating 12/31/2003 change in liability      0.001704
   d.   Contribution ratio for allocating 12/31/2004 change in liability      0.001649
   e.   Contribution ratio for allocating 12/31/2005 change in liability      0.001661

Employer's Share of 12/31/2005 UVB
1.   Share of prior years' pools ($0)                                           $0
2.   Share of 12/31/2001 pool ($15,370,099)                                 29,741
3.   Share of 12/31/2002 pool ($38,540,931)                                 69,528
4.   Share of 12/31/2003 pool (-$7,206,785)                                (12,280)
5.   Share of 12/31/2004 pool ($2,800,457)                                   4,618
6.   Share of 12/31/2005 pool ($14,569,620)                                 24,200
7.   Sum of pools                                                         $115,807
8.   De minimus amount: lesser of $50,000 and 3/4 of 1%
     of plan's UVB                                                          50,000
9.   Reduction in employer's share of UVB                                   34,193
10.  Employer's share of UVB (#7 - #9)                                      81,614

CHEIRON                                                                  6/17/2008

Exhibit 7 to Plaintiffs' L.R. 56.1(a) Statement

1          IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3    TRUSTEES OF THE SUBURBAN          )
     TEAMSTERS OF NORTHERN ILLINOIS    )
4    PENSION FUND,                     )
                                       )
5              Plaintiff,              )
                                       )
6         -vs-                         )  No. 08 C 788
                                       )
7    ROSELLE FARMERS LUMBER COMPANY,   )
     an Illinois corporation, a/k/a    )
8    ROSELLE LUMBER COMPANY,           )
                                       )
9              Defendant.              )

10

11         Deposition of GERALD KAMPHUIS, JR., taken before

12    DONNA L. POLICICCHIO, C.S.R., and Notary Public, pursuant

13    to the Federal Rules of Civil Procedure for the United

14    States District Courts pertaining to the taking of

15    depositions, at Suite 300, 19 West Jackson Boulevard,

16    Chicago, Illinois, commencing at 1:49 p.m., on the 13th

17    day of June, 2008.

18

19

20

21

22

23

24

1                          GERALD KAMPHUIS, JR.,

2       called as a witness herein, having been first duly sworn,

3       was examined upon oral interrogatories and testified as

4       follows:

                                EXAMINATION

6       BY MR. SANDERS:

7            Q    Could you please state your name for the

8       record?

9            A    Gerald Kamphuis, Jr.

10           Q    And, Gerry, have you ever given a deposition

11      before?

12           A    Yes.

13           Q    So you know to not have us talk over each

14      other and to give verbal responses to my questions so

15      the court reporter can take it down?

16           A    Yes.

17           Q    And is there any reason why you will be

18      unable to give truthful responses today?

19           A    No.

20           Q    Is there any medications you're on that might

21      impair your ability to --

22           A    No, uh-uh.

23           Q    Now, what is your relationship with a company

24      called Roselle Farmers Lumber Company?

1       A    President.

2       Q    And is that corporation still in business?

3       A    In business, no.

4       Q    Is it still incorporated?

5       A    Yes.

6       Q    How long has the business been around?

7       A    Since 1921.

8       Q    And has it had a relationship with Teamsters

9    Local 673?

10      A    For how long?

11      Q    Or has it is the first question.  Has it had

12   a relationship?

13      A    Yes.

14      Q    And that's through a collective bargaining

15   agreement?

16      A    Yes.

17      Q    And when did that relationship begin?

18      A    Prior to my getting involved with the

19   company.

20      Q    And when was that?

21      A    I got involved with the company in 1995.

22      Q    Okay.  And what -- and you said Roselle

23   Farmers Lumber Company -- I'll just call it

24   Roselle -- is no longer operating in business, is

1      that right?

2          A    Yes.

3          Q    It's in the process of winding up its

4      affairs?

5          A    Yes.

6          Q    What business did it have when it was

7      operating?

8          A    It was a supplier to contractors and

9      homeowners, remodelers of building materials and home

10     supplies.

11         Q    And under its collective bargaining agreement

12     with Local 673, it employed truckdrivers, is that

13     right?

14         A    Truckdrivers and warehousemen.

15         Q    And as part of that collective bargaining

16     agreement, it paid into the Suburban Teamsters

17     Pension Fund?

18         A    Yes.

19              (Exhibit 1 marked as requested.)

20     BY MR. SANDERS:

21         Q    Now, I have an exhibit here, which I'll

22     tender as Exhibit 1.  Here is a copy for you.  And

23     this merely is the front page and a signature page.

24              Is this one of the collective bargaining

1    agreements that was signed between 673 and Roselle?

2        A    Yes.

3        Q    Is that your signature on the second page?

4        A    Yes.

5        Q    It appears this was from the year 2000 to

6    2004?

7        A    Yes.

8        Q    And as part -- through that agreement,

9    Roselle regularly paid into the Pension Fund?

10       A    Yes.

11       Q    Now, what day or what month, if you can be as

12   specific as that, did the -- did Roselle cease

13   employing teamsters?

14       A    October 14th, 15th, something like that, of

15   2006.

16       Q    And did the company continue doing business

17   after that in other capacities?

18       A    No.

19       Q    So that was the date of closing,

20   October 14th, 15th?

21       A    Yes.

22            (Exhibit 2 marked as requested.)

23   BY MR. SANDERS:

24       Q    Here I now have what I'm tendering as

8

```
 1    Exhibit 2.

 2             Now, are you familiar with this document?

 3    Have you seen it before?

 4         A    Yes.

 5         Q    And on the first page of the document there

 6    is a letter and then there is a copy of a certified

 7    mail green card.

 8             Is that your signature on the green card?

 9         A    No.

10         Q    Do you recognize whose signature that is?

11         A    Yes.

12         Q    And who is it?

13         A    My wife.  That was a happy time.

14         Q    Understood.  So it appears it was in January

15    of '07?

16         A    Yes.

17         Q    And did you see this document at that time?

18         A    Yes.

19         Q    And what do you understand this document to

20    be?

21         A    A claim that I have not made payments that

22    they were requesting that I pay.

23         Q    When you say "they," you mean the Suburban

24    Teamsters Pension Fund?
```

```
 1        A    Yes.

 2        Q    And at this time -- I should go back -- you

 3   were the president of Roselle?

 4        A    Yes.

 5        Q    And since when have you been president of

 6   Roselle?

 7        A    August 21st of 2002.

 8             (Exhibit 3 marked as requested.)

 9   BY MR. SANDERS:

10        Q    Okay.  Now I have what I will tender as

11   Exhibit 3.

12             And do you recognize this document?

13        A    Yes.

14        Q    And, again, it is a letter with a copy of a

15   certified mail receipt -- green card.  Sorry.

16             Is that your signature on the green card?

17        A    Yes.

18        Q    And do you remember receiving this letter at

19   the time?

20        A    Yes.

21        Q    And what did you understand this letter to

22   mean?

23        A    Just the request for an installment payment

24   that they claim that I owe.
```

1                    (Exhibit 4 marked as requested.)

2       BY MR. SANDERS:

3           Q    I'll move on to what I have here as

4       Exhibit 4.  And on this one there is a copy of what

5       looks like a green card on Page 3.  First two pages

6       are a letter.

7                    Are you familiar with this document?

8           A    Yes.

9           Q    And on Page 3, is that your signature?

10          A    Yes.

11          Q    And you remember receiving this document at

12      the time it's dated?

13          A    Yes.

14          Q    And what is this document, you understand

15      this document to mean?

16          A    That same claim for payment that they are

17      claiming that Roselle Lumber owes.

18          Q    Now, have you made -- when I say you, I mean

19      Roselle -- has Roselle made any payments towards this

20      withdrawal liability amount?

21          A    No.

22          Q    Do you understand that -- whether or not

23      Roselle requested arbitration regarding withdrawal

24      liability?

1          MR. KLEIN:  What was the question?

2     BY MR. SANDERS:

3          Q    I'll simplify it.  Did Roselle request

4     arbitration of the issue of withdrawal liability?

5          A    No.

6          Q    Now who owns Roselle, Roselle Farmers Lumber,

7     or if it's more than one person or how it's owned,

8     you can explain it.

9          A    I'm the majority stockholder.

10         Q    What percent ownership do you have?

11         A    82 percent.

12         Q    And who owns the other 18 percent?

13         A    Various shareholders, multiple.

14         Q    What was your stock holding in 2006?  Was it

15    the same?

16         A    Yes.

17         Q    And how long have you owned the 82 percent of

18    stock?

19         A    August 21 of 2002.

20         Q    Now, I understand from your answers to

21    interrogatories that there are at least a couple

22    other businesses that you own some ownership share

23    in?

24         A    Yes.

ORIGINAL

**CONTRACT AGREEMENT**

**BETWEEN DUPAGE DEALERS ASSOCIATION**

**AND**

**TEAMSTERS UNION LOCAL 673**

**EFFECTIVE JUNE 1, 2000 THROUGH AND INCLUDING MAY 31, 2004**

```
018352330 08/22/00
ROSELLE LUMBER COMPANY
359 W. IRVING PARK RD.
ROSELLE      IL    60172
```



EXHIBIT
1



1



WORKING FORCES, INCLUDING THE MAKING AND ENFORCING OF RULES AND REGULATIONS TO ASSURE ORDERLY AND EFFICIENT OPERATION, INCLUDING MANAGEMENT RIGHTS ESTABLISHED BY PAST PRACTICE BETWEEN THE PARTIES OR BY LAW, ARE RIGHTS RETAINED BY MANAGEMENT OF THE

EMPLOYER EXCEPT WHEN SUCH RIGHTS ARE SPECIFICALLY RESTRICTED BY THE PROVISIONS OF THIS AGREEMENT OR BY LAW.

TEAMSTERS UNION LOCAL 673
1050 W. ROOSEVELT RD.
WEST CHICAGO, IL. 60185

THOMAS L. CUSTER
SECRETARY-TREASURER
& BUSINESS MANAGER

## EMPLOYER MEMBERS OF THE ASSOCIATION

**ROSELLE BUILDING MATERIALS**          BY:
303 W. IRVING PARK RD., ROSELLE
(630) 894-5200

**ROSELLE FARMERS LUMBER CO.**          BY:
ROSELLE ROAD AND IRVING PARK, ROSELLE
(630) 529-2431

**WESTMONT BUILDING PRODUCTS**          BY:
200 E. QUINCY ST., WESTMONT
(630) 968-3420

**WINFIELD FUEL AND MATERIAL**          BY:
0 S 080 WINFIELD RD., WINFIELD
(630) 665-1144

## NON-MEMBER EMPLOYER SIGNATURE

COMPANY                                SIGNATURE

35

# SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS
# PENSION FUND

1275 WEST ROOSEVELT ROAD, UNIT 121, WEST CHICAGO, ILLINOIS 60185

TELEPHONE 630-293-0390    FAX 630-562-0581

January 23, 2007

BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Roselle Farmers Lumber Company
Attention: Jerry Kamphuis
1 Windsong Way
Bloomington, IL 61704



Re:    Withdrawal Liability

Dear Mr. Kamphuis:

Roselle Lumber Company completely withdrew from the Suburban Teamsters of Northern Illinois Pension Fund ("Pension Fund") during the plan year ending on December 31, 2006. Under the provisions of Section 4219 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as modified by the Multiemployer Pension Plan Amendments Act of 1980, you are hereby notified that your company is obligated to pay the Pension Fund the amount of $81,614.00 as a withdrawal liability assessment. This amount is payable in quarterly installments of $13,431.00, commencing on February 1, 2007, and with following payments in the same amount due on May 1, 2007, August 1, 2007, November 1, 2007, February 1, 2008, May 1, 2008, with a final payment of $5,355.00 due on August 1, 2008. You may also discharge your obligation with a single payment of $81,614.00, payable on February 1, 2007. I have enclosed a copy of the calculation of the withdrawal liability.

If you fail to make any payment when due, the entire balance will become immediately due and payable and the Pension Fund will assess interest from the due date and will undertake appropriate legal action to collect the withdrawal liability. I also direct your attention to ERISA Sections 4219 and 4221 for a description of rights you may have in connection with this assessment of withdrawal liability.

Very truly yours,

Jose Colin

Encl
cc: Mr. Barry G. Collins
    Mr. David Feinstein
    Mr. John J. Toomey

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Roselle Farmers Lumber Co
Att: Jerry Kamphuis
1 Windsong Way
Bloomington IL 61704

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X  R Kamp                    ☐ Agent
                             ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery
   R Kamphuis                   1/25/0

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

RECEIVED
JAN 29 2007
Pension Fund Office

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise

EXHIBIT
2

**Suburban Teamsters of Northern Illinois Pension Plan**
Final Withdrawal Liability Calculation for Employers Withdrawing During 2006
Employer: Roselle Lumber Co.

## Contribution Ratio

1.  Contribution history

| | Plan Year Ended | Withdrawing Employer | All Employers |
|---|---|---|---|
| a. | 12/31/1997 | $29,654 | $12,096,364 |
| b. | 12/31/1998 | 27,484 | 13,223,359 |
| c. | 12/31/1999 | 27,521 | 14,752,462 |
| d. | 12/31/2000 | 29,465 | 16,928,651 |
| e. | 12/31/2001 | 32,288 | 18,662,984 |
| f. | 12/31/2002 | 33,761 | 19,863,738 |
| g. | 12/31/2003 | 33,553 | 21,689,466 |
| h. | 12/31/2004 | 36,677 | 23,393,802 |
| i. | 12/31/2005 | 43,834 | 24,821,098 |

2.  Contribution ratio for allocating changes in liability
    | | | |
    |---|---|---|
    | a. | Contribution ratio for allocating 12/31/2001 change in liability | 0.001935 |
    | b. | Contribution ratio for allocating 12/31/2002 change in liability | 0.001804 |
    | c. | Contribution ratio for allocating 12/31/2003 change in liability | 0.001704 |
    | d. | Contribution ratio for allocating 12/31/2004 change in liability | 0.001649 |
    | e. | Contribution ratio for allocating 12/31/2005 change in liability | 0.001661 |

## Employer's Share of 12/31/2005 UVB

| | | |
|---|---|---|
| 1. | Share of prior years' pools ($0) | $0 |
| 2. | Share of 12/31/2001 pool ($15,370,099) | 29,741 |
| 3. | Share of 12/31/2002 pool ($38,540,931) | 69,528 |
| 4. | Share of 12/31/2003 pool (-$7,206,785) | (12,280) |
| 5. | Share of 12/31/2004 pool ($2,800,457) | 4,618 |
| 6. | Share of 12/31/2005 pool ($14,569,620) | 24,200 |
| 7. | Sum of pools | $115,807 |
| 8. | De minimus amount: lesser of $50,000 and 3/4 of 1% of plan's UVB | 50,000 |
| 9. | Reduction in employer's share of UVB | 34,193 |
| 10. | Employer's share of UVB (#7 – #9) | 81,614 |

11/7/2006

**Suburban Teamsters of Northern Illinois Pension Plan**
Quarterly Repayment Schedule for Employers Withdrawing During 2006
Employer:  Roselle Lumber Co.

1.  Employer's share of UVB

$81,614

2.  Annual withdrawal liability payment

| | | Weeks Worked | Contribution Rate | |
|---|---|---|---|---|
| a. | 1993 plan year | | | |
| b. | 1994 plan year | | | |
| c. | 1995 plan year | | | |
| d. | 1996 plan year | 416 | | |
| e. | 1997 plan year | 477 | | |
| f. | 1998 plan year | 473 | | |
| g. | 1999 plan year | 436 | | |
| h. | 2000 plan year | 381 | | |
| i. | 2001 plan year | 347 | | |
| j. | 2002 plan year | 373 | | |
| k. | 2003 plan year | 407 | | |
| l. | 2004 plan year | 403 | | |
| m. | 2005 plan year | 416 | | |
| n. | High 3 consecutive year average of weeks worked | 424 | 113.00 | |
| o. | Highest contribution rate in the 10-year period | | | 462 |
| p. | Annual withdrawal liability payment | | | 113.00 |
| | | | | 52,206 |

3.  Valuation interest rate

8.00%

4.  Period of repayment

7 quarters

5.  Payment for first 6 quarters

$13,431

6.  Final payment

$5,355

**Suburban Teamsters of Northern Illinois Pension Plan**
Estimated Withdrawal Liability -  Contribution Worksheet

Date: 8/10/06

| 2499 & 2500 |
| --- |

Employer Name:     **Roselle Lumber Co.**

Employer contribution history

1. Plan year 1997 -   $ 29,654.00
2. Plan year 1998 -   $ 27,484.00
3. Plan year 1999 -   $ 27,521.00
4. Plan year 2000 -   $ 29,465.00
5. Plan year 2001 -   $ 32,288.00
6. Plan year 2002 -   $ 33,761.00
7. Plan year 2003 -   $ 33,553.00
8. Plan year 2004 -   $ 36,677.00
9. Plan year 2005 -   $ 43,834.00

Highest Contribution Rate: $ 113.00 per week.  — *no above*

*— Perry*                    *thought form*

*— Liquidate*

*— Term @ end of Sept.*

# SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS
# PENSION FUND

1275 WEST ROOSEVELT ROAD, UNIT 121, WEST CHICAGO, ILLINOIS 60185

TELEPHONE 630-293-0390        FAX 630-562-0581

April 2, 2007

**EXHIBIT**

**3**

BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Roselle Farmers Lumber Company
Attention: Jerry Kamphuis
1 Windsong Way
Bloomington, IL 61704

Re:  Withdrawal Liability

Dear Mr. Kamphuis:

On January 23, 2007, we advised you that Roselle Farmers Lumber Company was required to make its first quarterly withdrawal liability installment payment of $13,431.00 on February 1, 2007. You have not made the payment. You are now in default. You have 15 days to cure this default by paying the delinquent payment plus interest no later than April 16, 2007. If payment is not received by the April 16, 2007, your case will be deferred to the Fund's collection attorney.

Sincerely,

José Colín
Fund Manager

Encl
cc: Mr. Barry G. Collins
    Mr. David Feinstein
    Mr. John J. Toomey

HUGH B. ARNOLD
DANIEL N. KADJAN
JOHN J. TOOMEY
L. STEVEN PLATT
JOHN F. ETZKORN
DONALD D. SCHWARTZ
STEVEN F. McDOWELL

JAMES R. ANDERSON
PAIGE E. ARNOLD
PAUL M. EGAN
ANTHONY B. SANDERS
PHILIP BRZOZOWKSI
ROSS B. MANTELL

LAW OFFICES

# ARNOLD AND KADJAN

19 WEST JACKSON BOULEVARD

## CHICAGO IL

60604-3958

TELEPHONE (312) 236-0415
FAX # (312) 341-0438

PLEASE REFER TO
OUR FILE NUMBER

**EXHIBIT 4**

January 25, 2008

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
and REGULAR MAIL
Mr. Jerry Kamphuis
Roselle Farmers Lumber Company
1 Windsong Way
Bloomington, IL 61704

RE:   Roselle Farmers Lumber Company - Withdrawal Liability
Suburban Teamsters of Northern Illinois Pension Fund
Notice of Default and Acceleration of Withdrawal Liability
Obligation

Dear Mr. Kamphuis:

We represent the Trustees of the Suburban Teamsters of Northern Illinois Pension Fund. In a letter dated April 2, 2007, the Trustees notified Roselle Farmers Lumber Company that it had failed to make its first quarterly withdrawal liability installment payment of $13,431.00 on February 1, 2007. This amount has never been received by the Fund nor have the subsequent quarterly installments in the same amount that were due May 1, 2007, August 1, 2007, and November 1, 2007. Roselle Farmers Lumber Company is hereby notified that, based upon the failure to pay the February 1, 2007 installment within 60 days after its receipt of written notification that its February 1, 2007 payment was overdue and within 61 days of the period described in Section 4219(b)(2)(A) of ERISA, the Trustees declare Roselle Farmers Lumber Company in default of its withdrawal liability payment obligations and are accelerating and requiring immediate payment of the full amount of the withdrawal liability assessed of $81,614.00 together with interest calculated from the February 1, 2007 due date of the missed payment giving rise to the default.

Yours truly,

ARNOLD AND KADJAN

By:    John J. Toomey

JJT:cc
cc:    Mr. Jose Colin

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Jerry Kamphuis
Roselle Farmers
Credin Co
1 Windsong Way
Bloomington, IL 6170

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____  ☐ Agent  ☒ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
G. Kamphuis                        1-30-08

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☒ No

3. Service Type
   ☒ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)           ☐ Yes

2. Article Number
   (Transfer from _____

7002 2410 0005 9711 0711

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540